# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALEKA RUGGIERO, | : | 4:16-CV-01996 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| v. | : | |
| | : | |
| MOUNT NITTANY MEDICAL | : | |
| CENTER[1], | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### May 15, 2017

## I.    BACKGROUND

Plaintiff, Alexa Ruggiero, is a nurse who was terminated from her

employment with Defendant, Mount Nittany Medical Center.  Plaintiff maintains

that her termination was in violation of the Americans with Disabilities Act[2] and

filed the instant one-count action against her former employer.  Defendant

countered with a motion to dismiss, which is the subject of the instant

Memorandum Opinion. Additionally, Plaintiff has filed a motion to amend the

---

[1]  Although the docket is captioned with two Defendants, the other, previously named Defendant, Mount Nittany Health System, *doing business as* Mount Nittany Health, was dismissed by stipulation on October 19, 2016.

[2]  42 U.S.C. §§ 12101, *et. seq.*  Hereinafter "ADA."

complaint to add a claim under the Pennsylvania Human Relations Act.[3]  For the reasons that follow, both motions will be granted.

Plaintiff should be cautioned, however, that for the reasons expressed in this Memorandum Opinion, I consider her claim tenuous, at best, and I will not hesitate to summarily dismiss the amended complaint if the deficiencies identified herein are not rectified.

## II.    DISCUSSION

### A.    Standard of Review

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may file a motion to dismiss for "failure to state a claim upon which relief can be granted." Such a motion "tests the legal sufficiency of a pleading" and "streamlines litigation by dispensing with needless discovery and factfinding."[4]  "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."[5] This is true of any claim, "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one."[6]

---

[3]  Hereinafter "PHRA."

[4]  *In re Hydrogen Peroxide Litigation*, 552 F.3d 305, 316 n.15 (3d Cir. 2008) (Scirica, C.J.) (*quoting Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001) (Easterbrook, J.)). *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989).

[5]  *Neitzke*, 490 U.S. at 326 (*citing Hishon v. King & Spalding*, 467 U. S. 69, 73 (1984)).

[6]  *Neitzke*, 490 U.S. at 327.

Beginning in 2007, the Supreme Court of the United States initiated what some scholars have termed the Roberts Court's "civil procedure revival" by significantly tightening the standard that district courts must apply to 12(b)(6) motions.[7] In two landmark decisions, *Bell Atlantic Corporation v. Twombly* and *Ashcroft v. Iqbal*, the Roberts Court "changed . . . the pleading landscape" by "signal[ing] to lower-court judges that the stricter approach some had been taking was appropriate under the Federal Rules."[8] More specifically, the Court in these two decisions "retired" the lenient "no-set-of-facts tes"" set forth in *Conley v. Gibson* and replaced it with a more exacting "plausibility" standard.[9]

Accordingly, after Twombly and Iqbal, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[10] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[11] "Although the

---

[7] Howard M. Wasserman, THE ROBERTS COURT AND THE CIVIL PROCEDURE REVIVAL, 31 Rev. Litig. 313 (2012).

[8] 550 U.S. 544 (2007); 556 U.S. 662, 678 (2009), *Wasserman, supra* at 319-20.

[9] *Iqbal*, 556 U.S. at 670 (*citing Conley v. Gibson*, 355 U.S. 41 (1957)) ("[a]cknowledging that Twombly retired the Conley no-set-of-facts test").

[10] *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 570).

[11]*Iqbal,* 556 U.S. at 678.

plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."[12]  Moreover, "[a]sking for plausible grounds . . . calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [wrongdoing]."[13]

The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[14]  No matter the context, however, "[w]here a complaint pleads facts that are 'merely consistent wit' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[15]

When disposing of a motion to dismiss, a court must "accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]."[16]  However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable

---

[12]  *Connelly v. Lane Const. Corp.*, No. 14-3792, 2016 WL 106159, at *3 (3d Cir. Jan. 11, 2016) (Jordan, J.) (internal quotations and citations omitted).

[13]  *Twombly*, 550 U.S. at 556.

[14]  *Iqbal*, 556 U.S. at 679.

[15]  *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 557 (internal quotations omitted)).

[16]  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).

to legal conclusions."[17]  "After Iqbal, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss."[18]  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[19]

As a matter of procedure, the United States Court of Appeals for the Third Circuit has instructed that:

> Under the pleading regime established by Twombly and Iqbal, a court reviewing the sufficiency of a complaint must take three steps. First, it must tak[e] note of the elements [the] plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, [w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.[20]

I turn now  to the Plaintiff's factual allegations, which I must accept as true on a Rule 12(b)(6) motion.

B.      Facts alleged in the complaint

Plaintiff, Alexa Ruggiero, hereinafter "Ruggiero," commenced employment

---

[17]  *Iqbal*, 556 U.S. at 678 (internal citations omitted).

[18]  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.).

[19]  *Iqbal*, 556 U.S. at 678.

[20]  *Connelly*, 2016 WL 106159, at *4 (internal quotations and citations omitted).

with Defendant, the Mount Nittany Medical Center, hereinafter "MNMC" in 2008. Ruggiero is a registered nurse, who, according to the complaint, was "a dedicated and hard-working employee who performed her job well."[21]  Ruggiero suffers from both anxiety and eosinophilic esophagitis.  The complaint describes eosinophilic esophagitis as a "chronic immune system disease."[22]  Ruggiero asserts that because of these health conditions, "she is (at times) limited in her ability to perform some daily life activities, including but not limited to eating, sleeping, and engaging in social interactions."[23]

On April 22, 2015, MNMC sent a memo to all clinical employees, including Ruggiero, stating that it was instituting a new requirement that all clinical employees would be required to obtain a Tetanus, Diphtheria, and Pertussis, hereinafter "TDAP," vaccine.  In response, Ruggiero's physician, Suzanne Dib, M.D., issued a note advising MNMC that Ruggiero "is medically exempt from

---

[21]  ECF No. 1 at 3.

[22]  By way of further explanation, The Honorable Pamela K. Chen, writing earlier this year for the Eastern District of New York wrote "In eosinophilic esophagitis, a type of white blood cell (eosinophil) builds up in the lining of the tube that connects your mouth to your stomach (esophagus)."  *LaFerrera o/b/o M.J.S. v. Comm'r of Soc. Sec*., No. 15-CV-1735, 2017 WL 1207531, at *2 (E.D.N.Y. Mar. 31, 2017) *citing* http://www.mayoclinic.org/diseases-conditions/eosinophilic-esophagitis/basics/definition/con-20035681 (Last visited 3/23/2017).  "This buildup which is a reaction to foods, allergens or acid reflux, can inflame or injure the esophageal tissue." *Id.*  "Damaged esophageal tissue can lead to difficulty swallowing or cause food to get caught when you swallow."

[23]  ECF No. 1 at 4.

receiving tdap immunication for medical concerns."[24]  Emma Smith, RN,

hereinafter "Smith," the employee health coordinator for MNMC, replied to Dr.

Dib by letter dated June 10, 2015, requesting that Dr. Dib identify the medical

contraindication that applied to Ruggiero.  Precisely one month later, Dr. Dib sent

MNMC a letter in response that stated "Alexa Ruggiero is medically exempt from

receiving the Tdap immunization due to severe anxiety with some side effects she

read with this injection, especially with her history of having many food allergies,

environmental allergy and eosinophilic esophagitis."[25]

On July 15, 2015, Smith sent a letter to Ruggiero stating that "the

documentation provided by Dr. Dib does not meet the definition of medical

contraindication as detailed in the manufacturer's vaccine literature and thus Tdap

immunization is required."[26] Ruggiero was "effectively"[27] terminated on July 22,

2015, for not having obtained the Tdap vaccine.  Her termination was finalized on

July 31, 2015, in a writing entitled a "Record of Corrective Action."[28]   Ruggiero

asserts that her termination was in violation of the ADA.

---

[24] *Id.*

[25]ECF No. 1 at 5.

[26] *Id.*

[27] ECF No. 1 at 6.

[28] *Id.*

C.    Analysis

    1.    Plaintiff's Failure to Accommodate Claim will be dismissed.[29]

The ADA was designed to "eliminate" and "address discrimination against individuals with disabilities."[30]  Ruggiero argues that she has an "actual/perceived/record" of disability and MNMC retaliated against her and/or failed to accommodate her reasonable accommodation request.  "To state a claim for employment discrimination under the ADA, a plaintiff must demonstrate that he or she is a 'qualified individual with a disability' within the meaning of the Act, and that he or she has suffered an adverse employment decision as a result of the discrimination."[31]

Although, pursuant to *Connelly*[32], Ruggiero does not need to set forth a *prima facie* case of discrimination at this stage of the litigation, the elements of an ADA case nevertheless provide a useful roadmap as previously delineated by the United States Supreme Court, as follows.

---

[29]  "A claim brought under failure to accommodate does not require any evidence or inference of intentional discrimination" and the McDonnell Douglas framework is therefore not used to evaluate that type of claim.  *Norman v. Univ. of Pittsburgh*, No. CIV.A. 00-1655, 2002 WL 32194730, at *13 (W.D. Pa. Sept. 17, 2002)

[30]  42 U.S.C. § 12101(b).

[31]  *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 511-12 (3d Cir. 2001) *citing Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir.1999).

[32]  *Supra.*

First, the ADA says that an employer may not "discriminate against a qualified individual with a disability." 42 U.S.C. § 12112(a). Second, the ADA says that a "qualified" individual includes "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of" the relevant "employment position." § 12111(8). Third, the ADA says that "discrimination" includes an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified ... employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." § 12112(b)(5)(A)  Fourth, the ADA says that the term "reasonable accommodation" may include [job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.]" § 12111(9)(B).[33]

a.    <u>Ruggiero has alleged that she is a qualified individual with a disability</u>

"A 'qualified individual with a disability' is 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'"[34]  For the purposes of the ADA, a "disability" is "a physical or mental impairment that substantially limits one or more major life activities, a record of such an

---

[33]*U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 396 (2002)

[34]  *Id. citing* 42 U.S.C. § 12111(8).

9

impairment, or being regarded as having such an impairment."[35]  Major life

activities can include, among other things, "caring for oneself, performing manual

tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending,

speaking, breathing, learning, reading, concentrating, thinking, communicating,

and working."[36] Ruggiero alleges, and under Rule 12(b)(6) I must accept as true,

that she is limited in "her ability to perform some daily life activities, including but

not limited to eating, sleeping, and engaging in social interactions."[37]  MNMC first

argues that Ruggiero is not disabled as defined by the ADA, because she did not

allege how her conditions "substantially limit" any major life activity, she has

merely made a "naked assertion to that effect."[38]  The EEOC has issued regulations

defining the undefined terms from the statute.  "An impairment is a disability

within the meaning of this section if it substantially limits the ability of an

individual to perform a major life activity as compared to most people in the

general population."[39]  "The comparison of an individual's performance of a major

life activity to the performance of the same major life activity by most people in

---

[35]  42 U.S.C. § 12102(1).

[36]  42 U.S.C. § 12102(2)(A).

[37]  ECF No. 1 at 4.

[38]  ECF No. 16 at 11.

[39]  29 C.F.R. § 1630.2(j)(3)(ii).

the general population usually will not require scientific, medical, or statistical analysis."[40]  "The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity."[41]

"Given the rules of construction set forth in paragraphs (j)(1)(i) through (ix) of this section, it may often be unnecessary to conduct an analysis involving most or all of these types of facts."[42]  "This is particularly true with respect to impairments such as those described in paragraph (j)(3)(iii) of this section, which by their inherent nature should be easily found to impose a substantial limitation on a major life activity, and for which the individualized assessment should be particularly simple and straightforward."[43]  That subsection states:

> For example, applying the principles set forth in paragraphs (j)(1)(i) through (ix) of this section, it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: Deafness substantially limits hearing; blindness substantially limits seeing; an intellectual disability (formerly termed mental retardation) substantially limits brain function; partially

---

[40]  29 C.F.R. § 1630.2(j)(3)(v).

[41]  29 C.F.R. § 1630.2(j)(3)(iii).

[42]  29 C.F.R. § 1630.2(j)(4)(iv).

[43]  *Id.*

or completely missing limbs or mobility impairments requiring the use of a wheelchair substantially limit musculoskeletal function; autism substantially limits brain function; cancer substantially limits normal cell growth; cerebral palsy substantially limits brain function; diabetes substantially limits endocrine function; epilepsy substantially limits neurological function; Human Immunodeficiency Virus (HIV) infection substantially limits immune function; multiple sclerosis substantially limits neurological function; muscular dystrophy substantially limits neurological function; and major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia substantially limit brain function.[44]

Plaintiff argues that the Court cannot, and should not, determine if she has a disability as statutorily defined. This issue is a question of fact, best answered on summary judgment or at trial. That said, "whether the impairment substantially limits a major life activity is ordinarily a question of fact for the jury."[45] On a Rule 12(b)(6) motion, I must accept the factual assertions as true. Accordingly, I accept the factual assertions underlying her contention that she is a "qualified individual with a disability" because Ruggiero has alleged that she is substantially limited in what the EEOC has defined as major life activities.

                     b.    <u>Defendant has not disputed whether or not Ruggiero can perform the essential functions of the position with or without accomodation.</u>

Defendant does not dispute that Ruggiero could perform the essential

---

[44] 29 C.F.R. § 1630.2(j)(3)(iii).

[45] *Carter v. Pathfinder Energy Servs., Inc.,* 662 F.3d 1134, 1142 (10th Cir. 2011).

functions of her position as a nurse. Ruggiero alleged that "during her employment with Defendant, Plaintiff was a dedicated and hard-working employee who performed her job well."[46] Accordingly, it is undisputed that she has sufficiently stated this element of her claim.

The claim fails, however, primarily on the next two elements - Ruggiero did not advise MNMC that she had any sort of limitation necessary of accommodation and MNMC engaged in a good faith effort to accommodate her.

c.    <u>Ruggiero's mental and physical limitations were not known to MNMC</u>

MNMC next argues that it was unaware of Ruggiero's disability. "To establish discrimination because of a disability, an employer must know of the disability"[47] and "and the employee's desire for accommodations for that disability."[48] "The fact that plaintiff conveyed a health care professional's initial findings [a medical impairment] does not support an inference that Defendants were aware of a disability."[49] "Simply informing an employer of a particular condition is not tantamount to providing the employer with knowledge that the

---

[46] ECF No. 1 at 3.

[47] *Rinehimer v. Cemcolift, Inc*., 292 F.3d 375, 380 (3d Cir. 2002)

[48] *Taylor v. Phoenixville School District*, 184 F.3d 296, 313 (3d Cir.1999).

[49] Sever v. Henderson, 381 F. Supp. 2d 405, 418 (M.D. Pa. 2005), aff'd, 220 F. App'x 159 (3d Cir. 2007) (Vanaskie, J.).

employee is substantially limited in some major life activity."[50] "Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA."[51]

Beginning in July 2011, the MNMC required all new employees to provide documentation of having received the TDAP vaccine or have it administered through the employee health center.[52] On April 22, 2015, MNMC sent a memo to Ruggiero notifying her that she, along with all clinical employees, was now required to obtain the TDAP vaccine.[53] That memo is attached in full.

---

[50] *Id.*

[51] *Id.*

[52] ECF No. 17 at 4. Plaintiff argues against Defendant's use of exhibits. "Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). Typically, to consider materials outside the complaint, it must be converted to a motion for summary judgment. *See id.* and Fed. R. Civ. P. 12(d). However, "consideration of materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion." *Faulkner* at 134. It is permissible to consider full text of documents partially quoted in complaint. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808-09 (2d Cir.1996). It is also permissible to consider documents relied upon by plaintiff in drafting the complaint and integral to the complaint. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir.1991). "However, before materials outside the record may become the basis for a dismissal, several conditions must be met." *Faulkner* at 134. "For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Id, See also e.g., Kaempe v. Myers*, 367 F.3d 958, 965 (D.C.Cir.2004); *Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir.2001). It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document. *Faulkner* at 134. I find here, regarding all exhibits attached by Defendants, that all of the foregoing conditions have been met.

[53] ECF No. 17 at 4.



**MOUNT NITTANY.**
HEALTH

COPY

Memo to:      Aleka Ruggiero

Date:         April 22nd, 2015

From:         Emma S. Smith, Employee Health Coordinator

Subject:      Pertussis Vaccination (Tetanus Diphtheria Acellular Pertussis – Tdap)

Pertussis infections have been on the rise in the United States since 2002, primarily due to declining immunity in adults. Immunity declines 5-10 years after vaccination. Because there was no pertussis vaccine available for adults until 2005, most adults are susceptible to pertussis. *Almost all infant cases of pertussis (which can be fatal) are transmitted from adults.*

**What is Pertussis?**
Pertussis, or whooping cough, is a *highly contagious* infectious disease caused by the Bordetella pertussis bacteria that is found in the mouth, nose and throat of an infected person and spread through close contact when the infected person sneezes or coughs. An infected person is contagious before the onset of symptoms until up to three weeks after symptoms start. The time between becoming infected and experiencing symptoms is typically 7-10 days with a range of 5-21 days. The symptoms include a slight fever, cough, runny nose, and teary eyes. Persistent coughing spasms followed by the characteristic crowing or high pitch inspiratory "whoop" can occur, but this is less common in adults. Vomiting with cough is possible. Treatment with appropriate antibiotics shortens the contagious period to about five days.

**How can you protect yourself from Pertussis?** In June 2005, an acellular pertussis vaccine (Tdap) was licensed by the FDA for use in adults. (This vaccine also provides protection from Tetanus and Diphtheria.) The Advisory Committee on Immunization Practices (ACIP) now recommends that all adults ages 19 and up should receive one dose of Tdap. This recommendation is especially important for all healthcare workers who have not previously been vaccinated.

**What is Mount Nittany Medical Center doing to protect employees?**
Since July 2011, *all new employees* at Mount Nittany Medical Center have been required to provide documentation of having received this vaccination or receive it through the Employee Health Services office prior to their first employment date. The Medical Center now requires that all clinical employees that have no record of receiving the Tdap vaccination be immunized. If you have not been vaccinated, you may receive the vaccination by one of the following ways:

1. Call to schedule a convenient appointment for vaccination at no charge through the Medical Center's Employee Health Services at (814) 234-6731.
2. Schedule an appointment with your healthcare provider for vaccination. (Expenses for services provided outside of Employee Health Services are the sole responsibility of the employee and/or their health insurer.)

*If you have received this vaccination from your healthcare provider, please forward documentation of your vaccination to the Employee Health Services office at interdepartmental mailbox #48, to be included in your record.* You may also have your provider's office fax the record to our secure fax number: (814) 234-6179.

For more information regarding mandatory Tdap vaccination or pertussis, please contact Employee Health Services at (814) 234-6731. *You must receive your vaccination no later than May 15th, 2015. If you do not respond by the deadline, Employee Health Services will contact you to schedule an appointment.*

15

Ruggiero could have, but did not, allege facts that she advised MNMC that she was unable to take the TDAP vaccine because of her alleged disabilities. What transpired was, as follows. On May 18, 2015, Christina Duck, the MNMC employee health assistant, sent an email to Ruggiero notifying her that her vaccination was overdue.[54] On May 20, 2015, Ruggiero responded by email that she had "a doctor's appointment on June 2nd regarding the TDAP vaccine."[55] She did not tell MNMC either prior to the vaccine due date, nor in this May 2015 email exchange, that she did not intend to obtain the vaccine as required. Instead, on June 2, 2015, her physician, Dr. Suzanne Dib, sent the following note[56] to MNMC:



---

[54]  ECF No. 17 at 7.

[55]  ECF No. 17 at 6. May 8, 2017

[56]  ECF No. 17 at 9.

On June 10, 2015, in response, MNMC sent a letter to Dr. Dib explaining that the TDAP is mandatory for all employees, and asked Dr. Dib to provide the documented medical contraindication that provided the basis for non-compliance.[57] The letter was sent by Emma Smith and a copy was sent to Ruggiero. The text of that letter, in its entirety, reads as follows:

> Dear Dr. [Dib];
>
> I am in receipt of your note regarding Ms. Aleka Ruggiero dated June 2, 2015, wherein you request that Ms. Ruggiero be "medically exempt from receiving tdap immunization for medical concerns."
>
> Boostrix vaccine is the Tdap vaccine that is supplied at Mount Nittany Medical Center to all employees for our *mandatory* vaccination program. I have enclosed applicable information from the manufacturer (GSK) regarding Boostrix vaccine for your review. The manufacturer lists the following contraindication:
>
> 1. Hypersensisitivy (anaphylaxis)
> 2. Encephalopathy
>
> Additionally, the following warnings/precautions are listed:
>
> 1. Latex sensitivity
> 2. Guillain-Barre Syndrome and Brachial Neuritis
> 3. Syncope
> 4. Progressive or unstable neurologic disorders
> 5. Arthus-type hypersensitivity
> 6. Altered immunocompetence
>
> Employee Health Services records indicate that Ms. Ruggiero provided

---

[57] ECF No. 17 at 11-12.

upon pre-employment a record of past vaccination history that includes all standard childhood vaccinations plus school and college related vaccinations. No documented medical contraindications were noted or provided by Ms. Ruggiero.

There is a large body of evidence that supports Tdap vaccination of all healthcare personnel, most notably from the Centers for Disease Control (CDS) and the Advisory Committee on Immunization Practices (ACIP). While true medical contraindication would prohibit tdap vaccination, experience has shown that hte vaccination is well tolerated. In fact, with greater than 206 Tdap vaccinations provided to direct patient care providers through Employee Health Services (EHS) to date this year, there have been no reports of anaphylaxis and only few reports of minor local reaction at the injection site.

At this time the Medical Center is respectfully requesting that you identify the medical contraindication which prohibits Ms. Ruggiero from receiving this mandatory vaccination and provide appropriate documentation reflecting this. We ask that you consider discussing the potential for vaccination with Ms. Ruggiero if it is not medically contraindicated. Vaccination could occur though you, her provider, or through the Medical Center's EHS.

it is the Medical Center's objective to insure that tall staff and providers be vaccinated to potect all patients, but especially the most vulnerable. We greatly appreciate your efforts in assisting us with this process and we look forward to your response.[58]

A month later, on July 10, 2015, Dr. Dib responded to MNMC, as follows:

To Whom It mat [sic] Concern,

Aleka Ruggiero is medically exempt from receiving the Tdap immunization due to severe anxiety with some side effects she read with this injection, especially with her history of having many food allergies,

---

[58] ECF No. 17 at 11-12.

environmental allergy and eosinophilic esophagitis. Patient being terrified, I feel the risk, of this Tdap injection outweighs the benefits. Aleka understands the risks of not getting this immunization.[59]

"It is incumbent upon the employee to 'show that the employer knew of [the] employee's substantial physical or mental limitation' resulting from the diagnosed impairment."[60] "For purposes of proving ADA discrimination, it is important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any limitations experienced by the employee as a result of that disability."[61] "This distinction is important because the ADA requires employers to reasonably accommodate limitations, not disabilities."[62] "The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual."[63]

It is clear from the correspondence noted above that the earliest MNMC was aware of Ruggiero's anxiety and eosinophilic esophagitits was on July 10, 2015.

---

[59] ECF No. 17 at 17.

[60] *Sever* 381 F. Supp. 2d at 419 *citing Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 163 (5th Cir.1996).

[61] *Id.*

[62] *Id.*

[63] *Id. citing* 29 C.F.R. 1630.2(j), App. (1995); 42 U.S.C. § 12112(a)(5)(A).

It is not clear when, or if, MNMC was aware that she had limitations based on these alleged disabilities.[64] Although Ruggiero could amend her claim to allege that there is more evidence that MNMC was aware of both her disabilities and a need to accommodate them, the action turns on the final element, not likely cured by amendment: MNMC made a good faith attempt to accommodate Ruggiero.

> d. MNMC made a good faith attempt to accomodate Ruggiero despite its lack of knowledge of her mental and physical limitations

Even if I were to find, after reviewing an amended complaint, that MNMC was on notice of both her disability and need for accommodation, it appears that MNMC complied with the good faith process set forth in common law. Determining whether something "is a reasonable accommodation under the ADA is a mixed question of law and fact involving primarily legal principles."[65] "A court

---

[64] And, quite frankly, it is eminently unclear that she legitimately needed accommodation based on these disabilities. The letter from Dr. Dib explains that Ruggiero is worried about side effects from the TDAP that Ruggiero read about. It does not say that either her anxiety or her eosinophilic esophagitis were the medically based reasons she could not take the vaccine. I do not hold as I do on this basis, but I highly doubt a jury would find in Ruggiero's favor were the action to survive. The ADA was designed to protect individuals who legitimately cannot perform their job without accommodation. As the late Honorable James F. McClure, Jr. wrote in a similar action "[Plaintiff] fails to appreciate the nature of the restriction required to qualify as disabled. *Lindsay v. Pennsylvania State Univ.*, No. 4:06-CV-01826, 2009 WL 691936, at *14 (M.D. Pa. Mar. 11, 2009), *aff'd*, 367 F. App'x 364 (3d Cir. 2010). "Most people in the general population would agree that they feel the same discomfort that [Plaintiff] experiences." *Id.*

[65] *Id.* at 1146.

is permitted to determine the questions of "reasonableness" and "good faith" at the motion to dismiss stage.[66]

It is well settled in this Circuit that the employer and its employee must maintain open and effective lines of communication, a requirement that, although not statutory has come to be known as engaging in the "interactive process." As the Honorable Anthony J. Scirica stated in *Megine v. Runyon:*

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.[67]

"Although the ADA does not refer to such a process, the Third Circuit has endorsed the concept as a means of furthering the purposes of the ADA because it allows the employee to consider accommodations of which he may not otherwise be aware (particularly in a large organization) and, simultaneously, allows the employer to better understand the potential range of jobs the employee can do."[68]

---

[66] Hofacker v. Wells Fargo Bank Nat'l Ass'n, 179 F. Supp. 3d 463, 469 (E.D. Pa. 2016)

[67] 29 C.F.R. 1630.2(o)(3). *See also Mengine v. Runyon*, 114 F.3d 415, 416 (3d Cir. 1997) (Scirica, J.) ("[W]e believe 'reasonable accommodation' includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith.").

[68] *Norman v. Univ. of Pittsburgh,* No. CIV.A. 00-1655, 2002 WL 32194730, at *17 (W.D. Pa. Sept. 17, 2002)

"An employee who tries to hold his/her employer responsible for a breakdown in the interactive process under the ADA must show: 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability;  3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith."[69] "All the interactive process requires is that employers make a good-faith effort to seek accommodations." [70]

It appears from the allegations set forth by Ruggiero that MNMC engaged in a good faith effort to seek accommodation for her.  It is evident from the totality of the correspondence cited above that MNMC was willing to exempt Ruggiero from the vaccination requirement, had she merely provided evidence that her alleged disability was what precluded her from obtaining the vaccine as it was contraindicated by the manufacturer. It is clear from MNMC's responsive letter to Dr. Dib, that had Ruggiero suffered from either of the two contraindicated limitations (hypersensisitivy (anaphylaxis) or encephalopathy) or any of the six warnings (latex sensitivity; Guillain-Barre Syndrome and Brachial Neuritis;

---

[69]  *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 330-31 (3d Cir. 2003)

[70]  *Id.* at 333.

syncope; progressive or unstable neurologic disorders; arthus-type hypersensitivity; or altered immunocompetence) she would have been exempted from the vaccine requirement.  Those eight limitations appear to be the reasonable accommodations that MNMC was willing to provide.

What MNMC was unwilling to provide was accommodation for an employee who simply did not want to take the vaccine. "Title VII[71] does not mandate an employer or labor organization to accommodate what amounts to a "purely personal preference."[72]  Here, Ruggiero argues that she should have been permitted to wear a mask.  However, "by requiring the employer to engage in an interactive process, we do not hold that any particular accommodation must be made by the employer."[73]

MNMC made it clear in its correspondence that an employee may be exempted from the mandatory vaccination requirement, that applied to all of its employees, if it was medically contraindicated for that employee.  Ruggiero "is

---

[71]  "Courts analyzing ADA claims look to the principles guiding the interpretation and application of Title VII." *Miller v. Hogeland*, No. CIV. A. 00-516, 2000 WL 987864, at *2 (E.D. Pa. July 18, 2000)

[72]  *Grant v. Revera Inc./Revera Health Sys.,* No. CIV.A. 12-5857 JBS, 2014 WL 7341198, at *9 (D.N.J. Dec. 23, 2014) *citing EEOC v. Union Independiente de la Autoridad de Acueductos*, 279 F.3d 49, 56 (1st Cir.2002).  "

[73]  *Fjellestad v. Pizza Hut of Am., Inc.,* 188 F.3d 944, 954 (8th Cir. 1999).

essentially asking this court to establish the conditions of [her] employment."[74] That is not what the ADA was intended to provide. Instead, "Congress intended simply that disabled persons have the same opportunities available to them as are available to nondisabled persons."[75] "If it turns out that there is no job which the worker (with or without accommodation) is capable of performing, then the company cannot be held liable for an ADA ... violation."[76]

In sum, Plaintiff's Failure to Accommodate claim will be dismissed. If she is able to re-plead to cure these manifest deficiencies, she may amend.

### 2. Plaintiff's Disability Discrimination Claim will be dismissed.

"While a plaintiff is not required to make out a *prima facie* claim in order to survive a motion to dismiss, its composite elements are instructive in analyzing whether a plaintiff has alleged facts sufficient to give rise to a claim."[77] "Thus, to succeed at the pleading stage in an ADA claim, "a plaintiff must plausibly allege that (1) her employer took an adverse action against her, and (2)

---

[74] *Gaul v. Lucent Techs, Inc.,* 134 F.3d 576, 581 (3d Cir. 1998).

[75] *Id.*

[76] *Norman,* at *17.

[77] *Gonzalez v. Legends Hosp.*, No. 14CV6478DLIRER, 2017 WL 1166344, at *7 (E.D.N.Y. Mar. 27, 2017) *citing Bernadotte v. N.Y. Hosp. Med. Ctr. of Queens,* No. 13-CV-965, 2014 WL 808013, at *7 (E.D.N.Y. Feb. 28, 2014).

the disability or perceived disability was a "motivating factor" in the decision."[78]

In the matter at hand, Ruggiero has not alleged more than conclusory allegations of discrimination. She has not alleged that she was terminated because of her disability, she has merely alleged that she was terminated for her failure to comply with an employment requirement. If she can so affirmatively allege, she may amend her complaint to do so.

### 3. Plaintiff's Retaliation claim will be dismissed

"It is well settled that an ADA plaintiff may assert a claim for retaliation even if she fails to succeed on a disability discrimination claim."[79] "The ADA provides a remedy for retaliation by an employer against an employee who has "opposed any act or practice made unlawful by the ADA or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act."[80] Again, Ruggiero has set forth nothing more than conclusory allegations to state a claim; she has not shown that she 'participated in' or 'opposed' any activites protected by the ADA. If she

---

[78] *Id. citing Miller v. N.Y.C. Dep't of Educ.,* No. 16-CV-5306, 2016 WL 5947272, at *1-3 (E.D.N.Y. October 12, 2016) *(citing Hempstead Union*, 801 F.3d 72, 87) (dismissing claim for failure to provide facts that connected potential discrimination to Plaintiff's torn ligament and spinal damage).

[79] *Echevarria v. AstraZeneca Pharm. LP,* ___ F.3d ___, No. 15-2232, 2017 WL 1593474, at *9 (1st Cir. May 2, 2017).

[80] *Norman* at *19 (internal citation omitted).

can allege this, she may amend her complaint to do so.

       4.     Plaintiff's Motion to Amend

Plaintiff's motion to amend to add a claim under the Pennsylvania Human Relations Act will be granted.

## III.  CONCLUSION

Whether or not MNMC should or should not require employees to obtain a vaccine is not a question for the Court to determine[81]. What is in the best interest of a medical center, its staff, and patients, is a business decision that MNMC, not the courts, should make. What is clear from my review of the documentation is that <u>all</u> employees were required to be vaccinated, Ruggiero declined, MNMC offered her medically acceptable reasons for not obtaining the vaccine, and she failed to provide an acceptable reason.

Because "leave to amend a complaint 'shall be freely given when justice so

---

[81] "The Equal Employment Opportunity Commission ("EEOC") has offered general guidance on the issue." *Robinson v. Children's Hosp. Boston*, No. CV 14-10263-DJC, 2016 WL 1337255, at *6 (D. Mass. Apr. 5, 2016), *appeal dismissed sub nom. ROBINSON v. CHILDREN'S HOSPITAL OF BOSTON* (May 5, 2016) "In an informal discussion letter responding to an unnamed party's inquiries, the EEOC's Office of Legal Counsel wrote that 'the [f]acts relevant to undue hardship' for a health care worker's request for an exemption from employer-mandated vaccinations 'would presumably include, among other things, the assessment of the public risk posed at a particular time, the availability of effective alternative means of infection control, and potentially the number of employees who actually request accommodation.'" *Id.*

requires,'"[82] I will permit Ruggiero a final opportunity to do so. "The Supreme Court has interpreted [Rule 15's dictates] to mean that, in the absence of any apparent or declared reason such as undue delay, bad faith or dilatory motive on the part of the movant ... undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. the leave sought should, as the rules require, be freely given."[83]

However, that being said, if Plaintiff cannot allege sufficient facts to state a plausible claim for relief under prevailing law, counsel for Plaintiff should not refile an amended complaint this action.[84]

An appropriate Order follows.

BY THE COURT:

---

[82] *Ty, Inc. v. Publications Int'l, Ltd.*, No. 99 C 5565, 2004 WL 2359250, at *2 (N.D. Ill. Oct. 19, 2004), *citing* Fed. R. Civ. P. 15(a).

[83] *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

[84] *See Keister v. PPL Corp.*, 318 F.R.D. 247, 262 (M.D. Pa. 2015) (Brann, J.) (imposing reasonable attorney's fees under Federal Rule of Civil Procedure 11, where "the allegations in Plaintiff's Second Amended Complaint were unsupported at the time that [counsel for Plaintiff] wrote them, and were unlikely to ever gain factual support during the course of discovery, because they simply were inaccurate"), *aff'd*, - Fed. Appx. - , 2017 WL 383366 (3d Cir. 2017) (Fisher, J.).

s/ Matthew W. Brann
Matthew W. Brann
United States District Judge